UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
--------------------------------------------------X
ALLAN A. KASSENOFF, individually
and as guardian of his minor children
A.K., C.K. and J.K., and
CONSTANTINE GUS DIMOPOULOS,
                    *Plaintiffs,*

                                                            Case No.: 3:23-cv-24085-TKW-ZCB

                                                            Honorable Judge Kent. T Wetherell II

            v.

ROBERT HARVEY,
                    *Defendant.*
--------------------------------------------------X

**DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT [D.E. 7]
AND SUPPORTING MEMORANDUM OF LAW**

Date: November 27, 2023

                    DAVIDOFF LAW FIRM, PLLC

            By:     *Jonathan M. Davidoff*
                    Jonathan Marc Davidoff, Esq.
                    Florida Bar Number 179833
                    Aaron Renee Resnick, Esq.
                    Florida Bar Number 141097
                    *Attorneys for Defendant Robert Harvey*
                    100 Biscayne Blvd., Suite 1607
                    New York, NY 10017
                    Telephone: 212-587-5971
                    Email: jonathan@davidofflawfirm.com
                    Email: aresnick@thefirmmiami.com

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Tel: (212) 587-5971 ● Fax (212) 658-9852

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES …………..……………………………………...ii-v

INTRODUCTION …………………..……………………………………..….1

    I.      STANDARD OF REVIEW …………………………………….……..4

    II.    LEGAL ARGUMENT ….…………………………………….…………5

    A. THE AC VIOLATES FED. R.  CIV.P. 8, 10 AND 12(e) AND
        IS A SHOTGUN PLEADING…………………….  …………….…………5

    B. THE SINGLE PUBLICATION DOCTRINE REQUIRES
        DISMISSAL OF COUNTS IV AND V …………………….……..12

    C. THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
        CLAIM (COUNT IV) SHOULD BE DISMISSED ………………......…15

    D. TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
        (COUNT V) SHOULD BE DISMISSED …………………………20

    E. CYBERSTALKING (COUNT VI) SHOULD
        BE DISMISSED ……………………………………………… 25

    I.      THE DEFAMATION CLAIMS (COUNTS I, II, AND III) FAIL
        UNDER THE FAIR REPORTING PRIVILEGE ………..……………32

CONCLUSION …………………………………………………….. 33

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F) ……………...33

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Tel: (212) 587-5971 ● Fax (212) 658-9852

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Am. Dental Ass'n v. Cigna Corp.*, 6
    05 F.3d 1283 (11th Cir. 2010) ……………………………………… 5, 23

*Alexander v. United States,*
    509 U.S. 544 (1993) …………………………………………………… 29

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ……………………………………..…….…… 4, 5

*Becher v. Troy Pub. Co.,*
    183 A.D.2d 230 (3d Dep't 1992) ………………………………….... 32

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) …………………………………………...……4, 5

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010) …………………...……………………………29, 30

*Daniel Goldreyer, Ltd. v. Van De Wetering,*
    217 A.D.2d 434 (1st Dep't 1995) ………………………………… 33

*David v. Textor,*
    189 So. 3d 871 (Fla. 4th DCA 2016) ………………………… 27, 28

*Doe v. Samford Univ.,*
    29 F.4th 675 (11th Cir. 2022) ………………………………….. 5, 24

*Ello v. Singh,*
    531 F. Supp. 2d 552 (S.D.N.Y. 2007) …………………………..…….. 12

*Ethan Allen, Inc. v. Georgetown Manor, Inc.,*
    647 So. 2d 812 (Fla.1994) ………………………………….. 20, 21, 25

*Fisher v. Mitchell*,
    No. 3:22cv288-TKW-HTC, 2022 WL 19333275 (N.D. Fla. 2022) ……… 10

*Five for Ent. S.A. v. Rodriguez,*
    877 F. Supp. 2d 1321 (S.D. Fla. 2012) ………………………...…… 17

*Ford v. Levinson*,
    90 A.D.2d 464 (1st Dep't 1982) ……………………………………… 32

*Fridovich v. Fridovich,*
    598 So. 2d 65 (Fla. 1992) ………………………………………...… 14

*Grasso v. Ard Contracting, Inc.,*
    No. 4:21-CV-310-WS/MJF, 2022 WL 2654990 (N.D. Fla. 2022)
    …………………………………………………………...18, 19, 27

*Grayson v. No Labels, Inc.,*
    No. 620CV1824ORL40LRH, 2021 WL 2869870 (M.D. Fla. 2021) …….. 26

*George v. Time, Inc.,*
    259 A.D. 324, 325 (1st Dep't 1940) ………………………………… 37

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Tel: (212) 587-5971 ● Fax (212) 658-9852

*Griffin v. United States*,
    No. 3:18-CV-651-J-39MCR, 2019 WL 1092741 (M.D. Fla. 2019)
    …………………………………………………...……….…..13, 14, 15, 19
*Grlpwr, LLC v. Rodriguez*,
    No. 3:23CV16480-TKW-HTC, 2023 WL 5666203 (N.D. Fla. 2023)
    ……………………………………………………………….…... 13, 14
*Gurda v. Orange County Publications Div. of Ottaway Newspapers, Inc.*,
    81 A.D.3d 120 (2d Dep't 1981) ………………………………….…..37
*Hengjun Chao, M.D. v Mt. Sinai Hosp.*,
    476 F. App'x 892 (2d Cir. 2012) ……………………………………. 12
*Holy Spirit Ass'n for the Unification of World Christianity v. New York Times Co.*,
    399 N.E.2d 1185 (1979) ……………………………………...…….. 33, 37
*Hughes-Payne v. Argon Med. Devices, Inc.*,
    No. 3:22CV1944-TKW-ZCB, 2022 WL 19408078 (N.D. Fla. 2022) ….. 5, 6
*Jackson v. Bank of Am.*, N.A.,
    898 F.3d 1348 (11th Cir. 2018) ………………………………...…… 10
*Kamau v. Slate*,
    No. 4:21CV279-MW/MJF, 2023 WL 3142306 (N.D. Fla. 2023) ……...…20
*Klay v. United Healthgroup, Inc.*,
    376 F.3d 1092 (11th Cir. 2004) ………………………………………..25, 26
*Krapacs v. Bacchus*,
    301 So. 3d 976 (Fla. 4th DCA 2020) ………………… 26, 27, 29, 30, 31, 34
*Lampkin-Asam v. Volusia Cnty. Sch. Bd.*,
    261 F. App'x 274 (11th Cir. 2008) ………………………...………… 8, 9
*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ………………………………………...…… 29
*Miller v. Gizmodo Media Grp., LLC*,
    No. 18-24227-CIV, 2019 WL 1790248 (S.D. Fla. 2019) …………..…12, 15
*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ………………………………………………… 29
*Neeley v. Wells Fargo Fin., Inc.*,
    No. 8:12-CV-542-T-33AEP, 2012 WL 5949106 (M.D. Fla. 2012) ……… 17
*Nix v. ESPN, Inc.*,
    772 F. App'x 807 (11th Cir. 2019) ……………………………..… 11
*Ozyesilpinar v. Reach PLC*,
    365 So. 3d 453 (Fla. 3d DCA 2023) ……………….………………..25
*Papasan v. Allain*,
    478 U.S. 265 (1986) ………………………………….…………… 4
*Paul v. Mayo Clinic*,
    No. 3:15-CV-1244-HES-MCR, 2016 WL 11431491 (M.D. Fla. 2016)

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Tel: (212) 587-5971 ● Fax (212) 658-9852

………………………………………………..………... 15, 16
*Pucci v. USAir,*
    940 F. Supp. 305 (M.D. Fla. 1996) ……………………...…….. 17
*Realauction.com, LLC v. Grant St. Grp., Inc.,*
    82 So. 3d 1056 (Fla. 4th DCA 2011) …………………………..21
*Restore Robotics, LLC v. Intuitive Surgical,* Inc.,
    No. 5:19CV55-TKW-MJF, 2019 WL 8063988 (N.D. Fla. 2019) …... 19, 20
*Scott v. Blum,*
    191 So. 3d 502 (Fla. 2d DCA 2016) …………………………... 26, 27, 30
*Se. Promotions, Ltd. v. Conrad,*
    420 U.S. 546 (1975) …………………………………………..... 30
*Shawe v. Kramer Levin Naftalis & Frankel LLP,*
    167 A.D.3d 481 (1st Dep't 2018) ………………………………… 32
*Siegel v. Lepore,*
    234 F.3d 1163 (11th Cir. 2000) ………………………………….. 25
*T.D.S. Inc. v. Shelby Mut. Ins. Co.,*
    760 F.2d 1520 (11th Cir. 1985) ………………………...……. 6
*U.S. ex rel. Crenshaw v. Degayner,*
    622 F. Supp. 2d 1258 (M.D. Fla. 2008) ……………………..…16
*Wagner v. First Horizon Pharm. Corp.,*
    464 F.3d 1273 (11th Cir.2006) ………………………………...………9
*Wilchombe v. TeeVee Toons, Inc.,*
    555 F.3d 949 (11th Cir. 2009) …………………………………... 5
*Williamson v. Sacred Heart Hosp. of Pensacola,*
    No. 89-30084-RV, 1993 WL 543002 (N.D. Fla. 1993) …………………... 22
*Yeyille v. Miami Dade Cnty. Pub. Sch.,*
    643 F. App'x 882 (11th Cir. 2016) …………………………….. 9, 10

## **Statutes**                                                           **Page(s)**

Fed. R. Civ. P. 8 ……………………………………………...…… 1, 5, 6, 8, 9
Fed. R. Civ. P. 10 …………………………………………………… 5, 6, 8, 9
Fed. R. Civ. P. 12 …………………………………………………… 5
Fla. Stat. § 784.048 ……………………………………… 25, 26, 27, 28
N.Y. Civ. Rights Law §74 …………………………………...…… 31, 32

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, New York 10017 ● Tel: (212) 587-5971 ● Fax (212) 658-9852

## **INTRODUCTION**

Defendant, Robert Harvey ("Defendant"), a citizen journalist, hereby moves, pursuant to Fed. R. Civ. P. 8, 10, and 12(c) for an order dismissing the claims in this action[1]. Plaintiffs, Allan A. Kassenoff (the "Plaintiff" or "Kassenoff"), individually and as guardian of his minor children (A.K., C.K. and J.K. (collectively the "Children")) (collectively Kassenoff and the Children are referred to as the "Plaintiffs") fail to state a cause of action.  The AC is an excessively long, shotgun pleading that violates Fed. R. Civ. P. 8(a)(2) (it is 110 pages with over 205 allegations - many including unnumbered bullet points).   At its core, this action is Kassenoff suing Defendant because he did not appreciate Defendant's reporting related to (i) Plaintiff's divorce from his deceased wife, Catherine Kassenoff ("Catherine"), (ii) the handling of their divorce in the New York judicial system and (iii) allegations of abuse released by Catherine to the public related to the divorce proceedings. Defendant is a   citizen journalist (referred to by Plaintiff as an "social media influencer")(AC ¶65) who reported on Plaintiff and Catherine's story as it played out in their divorce action including Catherine ultimately committing suicide.

---

[1] *See* Amended Complaint docketed at ECF Dkt. No. 7, which is identified as "AC" throughout this motion.

Historically, Defendant used social media platforms, including Instagram and TikTok[2], @therobbieharvey, to post video news content that he created regarding women who suffered injustices in the judicial system ("a voice sharing your stories.") *Id.*; *see also* AC ¶71 and FN 42. Defendant has more than 3,000,000 followers on TikTok where he is the "voice for women". AC ¶¶65-66. Defendant reports on widespread issues affecting women throughout the world, including personal stories while working also to enact social and legislative change. *Id.* at ¶65.

On May 24, 2019, Gus Dimopoulous ("Dimopoulos"), on behalf of Plaintiff, commenced a divorce action against Catherine in the Westchester County, New York (the "Matrimonial Court"), Index No.: 58217/2019 (the "Matrimonial Action"). AC ¶39. On May 27, 2023, Catherine informed the public, via a Facebook post, that she was diagnosed with her third cancer diagnosis and had decided to end her own life via medically assisted suicide as she no longer desired to live having lost her children to Plaintiff because of alleged corruption in the Matrimonial Court (the "Suicide Post"). AC ¶60-61. Catherine stated that she "could no longer endure the abuse and terror of Allen Kassenoff" and detailed her experiences of the wrongdoings at the hands of judges, court appointed forensic evaluators, attorney

---

[2] https://www.pixlee.com/definitions/tiktok-bio ("The TikTok Bio is a section under your follower count on your profile where you can include designated information about yourself and/or your brand.")

for the children, Dimopoulos and Kassenoff. *Id.*  With the Suicide Post, Catherine included a public Dropbox link that included many documents, recordings, and videos that supported her assertions and arguments she made in the Matrimonial Action and other proceedings (the "Dropbox"). *Id.*

On May 31, 2023, Defendant uploaded to his TikTok page the first of a 25-part video news series (collectively the "Catherine-Series") about Catherine's "heartbreaking story" ("Video 1")("Exhibit "1"). AC ¶68. In Video 1, Defendant reports on Catherine's story next to the words "THIS IS A HEATBREAKING STORY" on the screen. *Id.* Over the next couple months, Defendant continued to upload the Catherine Series on his social media forums in which he: (1) reported on Catherine's story, the consequences Kassenoff suffered from the publication of the Suicide Post, and Defendant's efforts to obtain legislative reform in  family courts; and (2) expressed his opinion on these topics (no different than what one would see on the Morning Show, the View, Fox & Friends, and Morning Joe). *See* Exhibits "1"-"32."[3] Each of the videos discussed these topics (*id.*) and were included on a playlist that hosted the Catherine-Series in one location on each of Defendant's social media forums (AC ¶68).

---

[3] These video exhibits that make-up the Catherine-Series are included  the AC as hyperlinks, and are being provided to the Court in a flash/USB drive.

On September 5, 2023, Plaintiffs (along with Dimopoulos) commenced the instant action and it is believed Plaintiff then distributed the action to the media. On September 19, 2023, Plaintiffs filed the AC, removing Dimopoulos as a plaintiff, and alleging causes of action for defamation per se (Count I ), defamation (Count II), defamation by implication (Count III) (collectively the "Defamation Claims"), intentional infliction of emotional distress ("IIED") (Count IV)  and cyberstalking (Count V) .  As more fully discussed herein, both procedurally and substantively, this case should be dismissed.

## I.    STANDARD OF REIVEW

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)("labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Because the presumption of truth applies only to facts "labels and conclusions … couched as … factual allegation[s]" must be disregarded by the court. *Papasan v. Allain*, 478 U.S. 265, 286 (1986)

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," rather than the mere possibility that the defendant acted unlawfully. *Iqbal*, 556 U.S. 662 at 678. That is the factual allegations "must be

enough to raise a right to relief above the speculative level" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010); *Iqbal*, 556 U.S. at 678 (Rule 8 demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation").  Moreover, the facts supporting the claim must be "consistent with the allegations in the complaint." *Twombly,* 550 U.S. at 546. "Importantly, the [Supreme] Court held in *Iqbal,* as it had in *Twombly,* that courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Cigna Corp.*, 605 F.3d at 1290 (citation omitted, alteration adopted).

In considering a Rule 12(b)(6) motion, a court is generally limited to the facts contained in the complaint and attached exhibits *but may also* consider documents referred to in the complaint that are central to the claim and whose authenticity is undisputed. *Wilchombe v. TeeVee Toons, Inc.,* 555 F.3d 949, 959 (11th Cir. 2009).

## II.  <u>LEGAL ARGUMENT</u>

### A. THE AC VIOLATES FED. R.  CIV. P. 8, 10 AND 12(e) AND IS A SHOTGUN PLEADING.

"A complaint must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief,' and 'each claim founded on a separate transaction or occurrence ... must be stated in a separate count....' Fed R. Civ. P.

10(b)." *Hughes-Payne v. Argon Med. Devices, Inc.*, No. 3:22CV1944-TKW-ZCB, 2022 WL 19408078, at *1 (N.D. Fla. 2022). As explained by this Court:

> [t]he purpose of these rules is to require the pleader to present his claims discretely and succinctly, so that, his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.

*Id.* at *2 (quoting *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520 n.14 (11th Cir. 1985)(Tjoflat, J., dissenting)).

There is nothing "short of plain" about the AC (110 pages and over 205 allegations – and numerous unnumbered bullet points) which is repetitive, confusing, incoherent, and is replete with conclusory and vague assertions. "Pleadings of this nature are prohibited by Rule 8(a)(2), which requires a claim for relief to be 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

For example, the AC asserts Defamation Claims with respect to a series of videos and alleges numerous statements made by Defendant, which are alleged to be defamatory. Defendant is unable to discern which video(s) and/or statement(s) are alleged to be defamatory. Thus, the AC prohibits Defendant and the Court from reviewing each alleged defamatory statement in its context. Plaintiff also alleges that various comments Defendant made on videos constitute defamation, but he failed to

articulate which specific statement and/or video are defamatory. In fact, the AC pleads legal conclusions that the statements, comments, and videos were "false, misleading, and defamatory" but he failed to articulate any reason for such conclusion.

The incoherence and the confusing nature of the AC – particularly with respect to the Defamation Claims – cannot be understated. For example, Plaintiff alleges that Defendant falsely claimed that the court system is corrupt and defamed Kassenoff "by falsely claiming that he took advantage of that corruption to [Catherine]'s detriment:". AC ¶81. Plaintiff then pled four unnumbered bullet points, spanning more than two pages without alleging which statements are false, defamatory, or misleading, and why, and when such statements were made. Such is the case with virtually all the allegations.  It is simply impossible for Defendant to respond to a pleading in this format.

The AC is also riddled with irrelevant allegations devoted to matters outside the scope of this Action. For example, the AC contains allegations regarding "women [] have recently come forward and described and/or released extremely inappropriate and direct messages ("DMs") that [Defendant] has sent them over TikTok" (AC ¶65), allegations regarding Defendant's private messages to third persons on matters unrelated to the claims in this case (AC ¶66), allegations that Defendant has accused women of "lowering their standards" (AC ¶67), and photos

showing Defendant's home (AC ¶3). The AC also contains allegations regarding Catherine's journey to conceive the Children, Catherine's ex-boyfriends, Catherine's treatment of au-pairs, and allegations of Catherine's alleged treatment and abuse of Kassenoff and the Children dating back to 2009 (AC ¶14-29) – all of which are entirely irrelevant to the claims in this action. Clearly, Kassenoff used the pleading to air his "side of the story" and to attack Catherine (who is deceased and unable to defend herself) rather than to provide notice of the claims and the grounds upon which each is based.

As demonstrated above, the AC is "confusing, incoherent", vague and conclusory, and fails to set forth a "short and plain statement of [Plaintiffs'] claims showing that [he] [is] entitled to relief" in violation of Fed. R. Civ. P.  8. *Lampkin-Asam v. Volusia Cnty. Sch. Bd.,* 261 F. App'x 274, 277 (11th Cir. 2008).

The AC also violates Fed. R. Civ. P. 10. Rule 10(b) requires a complaint to contain "numbered paragraphs, each limited as far as practicable to a single set of circumstances" Fed. R. Civ. P. 10(b). The AC contains at least 145 unnumbered bullet points in violation of the rule. Additionally, almost every allegation in the AC, if not every allegation, contains multiple allegations regarding multiple sets of circumstances, warranting dismissal per Fed. R. Civ. P. Rules 8 and 10.

In the alternative, if this Court finds the AC to be permissible under Fed. R. Civ. P. 8 and 10, it should nevertheless direct Plaintiffs to better plead the AC. The

Eleventh Circuit has held that "district courts have a "supervisory obligation" under Rule 12(e), to *sua sponte* direct a plaintiff to better plead his complaint when "[it] […] fails to adequately link a cause of action to its factual predicates.'" *Lampkin-Asam,* 261 F. App'x at 277 (quoting *Wagner*, 464 F.3d at 1275). Similar to the case at bar, the complaint in *Wagner*, alleged in a general manner the elements required to state a cause of action following the incorporation clause in each count. The *Wagner* court concluded that it was insufficient for a complaint to allege factual predicates without "clearly link[ing] those facts to its cause of action" *Wagner*, 464 F.3d at 1280-81 ("The lack of [a meaningful] connection between the substantive count and the factual predicates is the central problem with each of the enumerated counts in the complaint.") Here, the Plaintiffs fail to sufficiently link the hundreds of factual allegations to each enumerated claim. As such,  at a minimum the Court should direct Plaintiffs to plead a better complaint.

The AC is a shotgun pleading because it "fails to articulate claims with sufficient clarity to allow the [D]efendant to frame a responsive pleading". *Lampkin-Asam v.,* 261 F. App'x at 277. "'Shotgun' pleadings are cumbersome, confusing complaints that do not comply with these pleading requirements" (*Yeyille v. Miami Dade Cnty. Pub. Sch.*, 643 F. App'x 882, 884 (11th Cir. 2016)) and are subject to dismissal "on that basis alone." *Fisher v. Mitchell*, No. 3:22cv288-TKW-HTC, 2022 WL 19333275, at *2 (N.D. Fla. 2022)(quoting *Jackson v. Bank of Am.*, N.A., 898

F.3d 1348, 1357 (11th Cir. 2018)("We have condemned shotgun pleadings time and again, and this is why we have repeatedly held that a District Court retains authority to dismiss a shotgun pleading on that basis alone.")

The Eleventh Circuit has identified four general types of shotgun pleadings: a complaint (1) in which each count adopts the allegations of all preceding counts; (2) that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) that does "not separate each cause of action or claim for relief into a different count"; and (4) that "assert[s] multiple claims against multiple defendants without specifying which applies to which." *Yeyille*, 643 F. App'x at 884. "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.,* 792 F.3d 1313, 1323 (11th Cir. 2015).

For example, the AC is an impermissible shotgun pleading as each Defamation Claim[4] incorporates the same facts in each count (paragraphs 1-122 and

---

[4] Defendant contends that New York law is applicable to the Defamation Claims, and the respective privileges and affirmative defenses, and concedes that Florida law applies to the remaining causes of action. Under Florida choice-of-law rules, where there is an allegation of the publication of defamatory statements, and such is accessible anywhere, ""the "state of most significant relationship" is the state where

135-140) rendering it is impossible to discern which facts are intended to support each distinct claim and whether the claims are adequately pled.  In that same vein, Count IV for IIED lumps both Plaintiffs together and includes all 155 general allegations (AC ¶177) including the unnumbered bullet points as does Count VI for Cyberstalking (AC ¶192).  Simply put, the AC is the quintessential shotgun pleading and Plaintiffs should be required to replead the AC in accordance with the Federal Rules of Civil Procedure.

### B. THE SINGLE PUBLICATION DOCTRINE REQUIRES DISMISSAL OF COUNTS IV AND V.

"Under both Florida and New York law, a plaintiff cannot proceed on concurrent counts for related torts that are "intended to compensate for the same alleged harm" as a defamation claim." *Miller v. Gizmodo Media Grp., LLC*, No. 18-24227-CIV, 2019 WL 1790248, at *11 (S.D. Fla. 2019)(citation omitted). As noted in *Miller* "'New York law considers claims sounding in tort to be defamation claims … where those causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by plaintiff flows from the effect on his

---

the plaintiff was domiciled or had its principal place of business at the time. *Nix v. ESPN, Inc.,* 772 F. App'x 807, 810 (11th Cir. 2019). Here, Kassenoff is domiciled, worked and endured injuries in New York (AC ¶¶9, 126, 128). Thus, as discussed below, New York's fair and accurate reporting privilege bars the Defamation Claims.

reputation.'" *Id.* (citing *Hengjun Chao, M.D. v Mt. Sinai Hosp.,* 476 F. App'x 892, 895 (2d Cir. 2012)(alterations adopted). "The rule is designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm." *Grlpwr, LLC v. Rodriguez,* No. 3:23CV16480-TKW-HTC, 2023 WL 5666203, at *7 (N.D. Fla. 2023)(citation omitted). Thus, under the single publication doctrine, a cause of action that is based on another tort cannot be maintained "regardless of whether [a plaintiff] chooses to assert the alternative claim, succeeds on the alternative claim, or the alternative claim is barred." *Griffin v. United States*, No. 3:18-CV-651-J-39MCR, 2019 WL 1092741, at *7 (M.D. Fla. 2019)(citation omitted). "In contrast, a plaintiff may recover for separate claims when they are 'properly pled upon the existence of independent facts.'" *Miller*, 2019 WL 1790248, at *11.

The Tortious Interference claim, like the Defamation Claims, is based on the allegation that Defendant disseminated allegedly defamatory statements in videos that caused harm to Kassenoff's employment and professional reputation. Thus, because the Tortious Interference claim is predicated upon the same factual allegations as the Defamation Claims, and seeks the same damages, it must be dismissed. *Id.* (dismissing a tortious interference with business relationships claim as one sounding in defamation).

The IIED Claim asserted by the Children must also be dismissed as a "plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as "outrageous."" *Fridovich v. Fridovich,* 598 So. 2d 65, 70 (Fla. 1992). "The single publication/single action rule ... does not permit multiple actions when they arise from the same publication upon which a failed defamation claim is based." *Grlpwr*, 2023 WL 5666203, at *7 (citation omitted, alterations adopted). Moreover, "a claim for intentional infliction of emotional distress cannot be maintained when the risk that emotional distress will result is merely incidental to the commission of some other tort" *Griffin*, No. 2019 WL 1092741, at *7 ("Where, as here, the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available.")

Here, the IIED Claim is predicated solely upon Defendant's dissemination of the allegedly defamatory statements in the videos and the emotional harm the Children suffered as a result of the allegedly defamatory statements made about Kassenoff. AC ¶¶180, 182. To be sure, the "egregious" conduct that forms the basis for the IIED Claim is "[t]he revilement [Defendant] inflicted upon Mr. Kassenoff, the [Children]'s father" (AC ¶180) and the facts upon which it is based are the exact same upon which the Defamation Claims are based. AC ¶¶156, 162, 168, 177. As such, the IIED Claim explicitly sounds in defamation, *Miller*, 2019 WL 1790248, at

*11, and the emotional harm the Children are alleged to have suffered is "merely incidental to the commission of" the Defamation Claims. *Griffin*, No. 2019 WL 1092741, at *7 Accordingly, the IIED Claim should also be dismissed.

### C. THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM (COUNT IV) SHOULD BE DISMISSED

"To plead a claim for IIED, a plaintiff must plausibly allege four elements: "(1) defendant acted recklessly or intentionally; (2) defendant's conduct was extreme and outrageous; (3) defendant's conduct caused the plaintiff's emotional distress; and (4) plaintiff's emotional distress was severe." *Paul v. Mayo Clinic*, No. 3:15-CV-1244-HES-MCR, 2016 WL 11431491, at *4 (M.D. Fla. June 16, 2016)(citation omitted). The IIED claim alleges that Defendant's defamatory statements about Kassenoff constitutes extreme and outrageous conduct that caused and will continue to cause the Children severe emotional distress due to the harm the Catherine Series caused Kassenoff (AC ¶¶ 180-181), yet fails to allege the elements required to state such claim.

The AC does not allege that the Defendant's conduct was directed at the Children "which is a required showing as part of the first IIED element." *Paul*, 2016 WL 11431491, at *4. Rather, the alleged 'outrageous' conduct of Defendant making defamatory statements about Kassenoff in the Catherine Series (AC ¶182) and

directing his followers to contact Kassenoff's employer to have Kassenoff terminated (AC ¶126) is conduct alleged to have been directed at Kassenoff.

Both Florida state and federal courts hold that "even where the requisite outrageousness occurred in the defendant's acts toward the original victim, the emotional distress felt by close relatives of that victim when they learned of the acts was not actionable if the relatives were not present during the acts *and the defendant's conduct was not directed at the relatives*." *Paul*, 2016 WL 11431491, at *4 (citation omitted). The AC does not allege that the conduct was directed at the Children, rather it alleges that the Children suffered emotional distress when they learned of such conduct from others. AC ¶¶ 151, 154.  Here, the IIED claim fails because the outrageous conduct is alleged to be directed at Kassenoff, not the Children.

Further, "a defendant's conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *U.S. ex rel. Crenshaw v. Degayner*, 622 F. Supp. 2d 1258, 1281-1822 (M.D. Fla. 2008)(citation omitted)(noting that "IIED claims are "sparingly recognized" by Florida courts). "The 'plaintiff's subjective response to the conduct does not control'; rather, "'the conduct must be evaluated on an objective basis.'" *Id.* (citation omitted). Accordingly, whether the alleged conduct satisfies this extremely high standard is a

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, NY 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

question to be decided by the court as a matter of law. *Neeley v. Wells Fargo Fin.,*

*Inc.,* No. 8:12-CV-542-T-33AEP, 2012 WL 5949106, at *2 (M.D. Fla. Nov. 28,

2012).

Mere obscenities, insults, indignities, threats, false allegations, annoyances,

petty oppressions, or other trivialities do not rise to the level of conduct required for

an IIED claim. *Pucci v. USAir,* 940 F. Supp. 305, 309 (M.D. Fla. 1996); *Five for*

*Ent. S.A. v. Rodriguez,* 877 F. Supp. 2d 1321, 1329 (S.D. Fla. 2012)("threatening to

breach a contract and encouraging third parties to disparage Plaintiffs simply does

not rise to the level of outrageousness required"). The Children fail to plead any

conduct that rises to the level of outrageous conduct required to state a cause of

action for themselves.

The AC also fails to allege that Defendant's conduct caused the Children to

suffer severe emotional distress as it only asserts conclusory allegations. The AC

alleges that (i) the Children suffered "as a result of the Harvey Videos"; (ii) the

Children heard classmates discuss Catherine's suicide and Kassenoff's abuse of the

Children; (iii) classmates informed the Children that their parents were in a "group

chat" discussing such that caused the Children emotional distress; (iv) and other

claims that Plaintiffs deem concerning. AC ¶154. Absent, however, from the AC is

any factual allegation from which it can be inferred that these persons learned of

such from the Catherine Series and not from: (i) the Suicide Post, and the Dropbox,

which included 3,137 filings from the Matrimonial Action, court hearing transcripts and "videos depicting Mr. Kassenoff and the Children, amongst other things" (AC ¶¶ 60-62); and (ii) from the various other media outlets and websites reporting on Catherine's suicide and the Matrimonial Action. AC ¶¶ 100, 116. Allegations that are merely consistent with Defendant's liability standing alone are insufficient to state a claim. *Samford Univ.,* 29 F.4th 675 at 685-686.

Not only does the AC plead a "simply a conclusory recital of the element[s]" which is "insufficient" to state an IIED claim, but the AC fails to allege severe emotional distress. *Grasso v. Ard Contracting, Inc.,* No. 4:21-CV-310-WS/MJF, 2022 WL 2654990, at *5 (N.D. Fla. June 8, 2022). Other than alleging that J.K suffered from panic attacks while away at camp and that "C.K. once called Mr. Kassenoff crying, asking him to pick her up from school" the AC pleads only insufficient conclusory allegations that the Children suffered severe emotional distress. AC ¶154.

As for severity, "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it" meaning that the "emotional duress must be of such substantial quality or enduring quality that no reasonable person in a civilized society should be expected to endure it." *Grasso*, 2022 WL 2654990, at *5. While the distress suffered by the Children related to the divorce proceeding and Catherine's public suicide is not lost on Defendant, the

distress allegedly suffered does not rise to the level of severity required, and thus insufficient to assert an IIED claim.

Lastly, the AC fails to allege that Defendant intended to cause the Children emotional distress (and that the distress endured arose from Defendant's conduct). The gravamen of the AC is that defamation and the alleged emotional distress is merely incidental to such claim(s). Thus, because "emotional distress was not the intended or primary consequence of [Defendant's] conduct" (and the AC fails to connect such) the Children cannot state a claim for IIED. *Griffin*, 2019 WL 1092741, at *7 (citation omitted).

### D. TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP (COUNT V) SHOULD BE DISMISSED

To assert a claim for "tortious interference with a business relationship under Florida law, a plaintiff must allege: (1) the existence [of] a business relationship, (2) the defendant's knowledge of that relationship, (3) an intentional and unjustified interference with the relationship, and (4) injury resulting from the breach of the relationship." *Restore Robotics, LLC v. Intuitive Surgical,* Inc., No. 5:19CV55-TKW-MJF, 2019 WL 8063988, at *4 (N.D. Fla. Nov. 14, 2019)(citation omitted, alteration adopted).

A plaintiff asserting such claim is "required to specifically identify the customers or clients that are the subject of a defendant's alleged interference" and

"the extent of Plaintiff's […] business relationships with them." *Kamau v. Slate*, No. 4:21CV279-MW/MJF, 2023 WL 3142306, at *6 (N.D. Fla. 2023). Other than Samsung, the AC fails to identify any specific client that Defendant allegedly interfered with and fails to allege the extent of Kassenoff's business relationships with Samsung and Greenberg Traurig's ("Greenberg") other clients.[5] AC ¶186. Accordingly, with respect to "Greenberg Traurig['s] clients, including Samsung" (*id.*) the AC fails to state a claim for tortious interference with a business relationship.

A protected business relationship must be "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So. 2d 812, 815 (Fla.1994). As to Samsung and Greenberg's other clients (collectively, "Greenberg Clients"), the AC fails to allege such. As alleged, the Greenberg Clients are not the clients of Kassenoff, but Greenberg's. AC ¶186. Kassenoff was merely employed by Greenberg (AC ¶123), and "over the years" he represented the Greenberg Clients. AC ¶¶123-125, 186. However, the AC does not allege that Kassenoff represented the Greenberg Clients at the time of the alleged interference (AC ¶125) or that Kassenoff had an actual and identifiable

---

[5] Plaintiff was a former partner at Greenberg.  (CITE).

understanding or agreement (individually) with the Greenberg Clients that he would definitively represent them in the future. A speculative hope of future business, which is at most what the AC alleges, is insufficient to sustain a claim of tortious interference with a business relationship. *Realauction.com, LLC v. Grant St. Grp., Inc.*, 82 So. 3d 1056, 1060 (Fla. 4th DCA 2011).   Additionally, a claim for tortious interference with a business relationship must be predicated upon a business relationship that affords the claimant's existing or prospective legal or contractual rights. *Ethan Allen*, 647 So. 2d at 812. Such is notable because the AC specially alleges that the Greenberg Clients are the clients of Greenberg and does not allege that Kassenoff had an actual and identifiable agreement with the Greenberg Clients separate and apart from the Greenberg Clients' agreement(s) with Greenberg. The AC also does not allege that the Greenberg Clients terminated an existing, or did not execute a new, agreement for future services with Kassenoff (or Greenberg) as a result of the alleged interference. As such, Kassenoff does not have standing to bring such a claim as to the Greenberg Clients.

Moreover, "to be actionable, the interference must be direct" *Williamson v. Sacred Heart Hosp. of Pensacola*, No. 89-30084-RV, 1993 WL 543002, at *51 (N.D. Fla. May 28, 1993), aff'd sub nom. *Williamson v. Sacred Heart Hosp.*, 41 F.3d 667 (11th Cir. 1994). As to the Greenberg Clients, Kassenoff's claim is predicated solely upon Greenberg request for him to resign from the firm which he claims was

interference with his business relationships with the Greenberg Clients. AC ¶133. In fact, the AC pleads that Defendant directed his "followers to go after Greenberg Traurig clients" (the "Video 5")(Exhibit "5") "did not result in Mr. Kassenoff getting fired". AC ¶¶127-128. Notably, Plaintiffs allege that only Defendant's June 9, 2023 video, in which Defendant directed his followers to call a human resources conference where a Greenberg employee was speaking, "worked" in that Defendants followers called the conference, resulted in Kassenoff's resignation from Greenberg (the Video "6"). AC ¶¶130-131. Yet, the AC does not allege that the company that hosted the conference was a client of Kassenoff or Greenberg. Therefore, any alleged consequences from Video 6 were only indirect and thus, nonactionable.

The claimed interference with the Greenberg Clients was only an indirect consequence of Greenberg's alleged requirement that Kassenoff resign and as such, there is no actionable claim for tortious interference with the Greenberg Clients. Indeed, Kassenoff voluntarily resigned, and thus he voluntarily terminated his employment with Greenberg and its clients. Plaintiff has failed to plead facts to plausibly allege that any of the Defendant's conduct caused Kassenoff damages with respect to existing Greenberg Clients and existing work from that clientele.

The tortious interference claim with respect to Kassenoff's employment and relationship with Greenberg also fails. On or about June 3, 2023, Greenberg issued a statement, reported on by Defendant, informing the public that: (i) Greenberg was

aware of the allegations of Kassenoff's abuse; (ii) "the firm will be conducting its own investigation [into Kassenoff] to determine his status with the firm"; and (iii) "[i]n the meantime, [Kassenoff] is taking a voluntary leave to absence" (the "Greenberg Announcement"). Exhibit "3." The AC fails to allege facts to suggest that Defendant's conduct, rather than Greenberg's own independent investigation, caused Kassenoff to be terminated by Greenberg. *Cigna Corp.,* 605 F.3d 1283 at 1920 ("courts may infer from factual allegations in the complaint "obvious alternative explanations" which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.") In fact, Kassenoff admitted that he received a compensation package when he decided to voluntarily resign. AC ¶133 ("GT's CEO told Mr. Kassenoff that he had until the next day (subsequently extended to June 11) to "voluntarily" resign (and receive a severance package) or he would be fired (and receive nothing).") On June 7, 2023, after Greenberg's announcement that Kassenoff resigned, it is alleged that Defendant posted a video which included Kassenoff's contact information ("Video 4"). AC ¶126. However, Plaintiff pled that Video 4 "failed to achieve [Defendant's] goal of getting Mr. Kassenoff fired" AC ¶127. Plaintiff also pled that Video 5, also "did not result in Mr. Kassenoff getting fired." AC ¶128. As alleged, it was only Video 6, posted on June 9, 2023, that "worked" in encouraging Defendant's followers contact the conference and "attack it via social medial" thereby forcing Greenberg to terminate

Kassenoff's employment. AC ¶130-131. However, as alleged, that same day, Greenberg informed Kassenoff that he must resign. AC ¶133. The allegations as to Defendant's 'voluntary' resignation are not only inconsistent with Kassenoff's claim that Defendant caused Kassenoff's termination, but in light of the Greenberg Announcement and the timeline of events as alleged, Kassenoff's failure to plead factual allegations that demonstrate Defendant's conduct was the cause of the 'forcible resignation' and not Greenberg's own independent investigation into Catherin's allegations is fatal to this cause of action. *Samford Univ.,* 29 F.4th 675 at 685 ("Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible.") Furthermore, as stated above, Kassenoff admitted that he accepted a severance package in exchange for his resignation, so he voluntarily resigned and was not terminated, thus he caused his own damages. AC ¶133.

Finally, "[n]ews reporting is not the kind of "improper" conduct on which [a plaintiff] can base a tortious interference claim" and "the tort of interference is not met by communications to the public at large." *Ozyesilpinar v. Reach PLC*, 365 So. 3d 453, 460-461 (Fla. 3d DCA 2023)(citing *Ethan Allen,* 647 So. 2d at 815). Here, the claim is predicated upon Defendant's citizen reporting on the Matrimonial Action, thus the tortious interference claim should be dismissed.

### E. CYBERSTALKING (COUNT VI) SHOULD BE DISMISSED

Count VI, seeking a preliminary and permanent injunction pursuant to Fla. Stat. § 784.048, should be dismissed as it seeks the imposition of a prior restraint in violation of Defendant's First Amendment Constitutional rights.

> A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Siegel v. Lepore,* 234 F.3d 1163, 1176 (11th Cir. 2000). "The standard for a permanent injunction is essentially the same as for a preliminary injunction except that the plaintiff must show actual success on the merits instead of a likelihood of success." *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1097 (11th Cir. 2004)(citation omitted). Additionally, even where a plaintiff demonstrates a violation of a statutory right, the plaintiff "must also meet the other requirements for obtaining an injunction to show that an injunction is the proper remedy for such violation. *Id.* at 1908.

"[C]yberstalking is harassment via electronic communications." *Scott v. Blum,* 191 So. 3d 502, 504 (Fla. 2d DCA 2016). "Harass" is defined as "to engage in a court of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." Fla. Stat. §784.048(a).

**DAVIDOFF LAW FIRM, PLLC**
228 East 45th Street, Suite 1110, New York, NY 10017 ● Telephone (212) 587-5971 ● Fax (212) 658-9852

"Cyberstalk" is defined as "engag[ing] in a course of conduct to communicate, or to cause to be communicated, directly or indirectly, words, images, or language by or through the use of electronic mail or electronic communication, directed at or pertaining to a specific person" Fla. Stat. §784.048(d)(1) "and Florida courts require the communications to be *directed at* the plaintiff." *Grayson v. No Labels, Inc.,* No. 620CV1824ORL40LRH, 2021 WL 2869870, at *6 (M.D. Fla. Jan. 26, 2021)(emphasis in original). A "course of conduct" is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose." § 784.048(1)(b), Fla. Stat. "The term [however] does not include constitutionally protected activity such as picketing or other organized protests." *Krapacs v. Bacchus,* 301 So. 3d 976, 978 (Fla. 4th DCA 2020)(citation omitted).

The AC fails to state a claim for cyberstalking and harassment as the AC merely alleges that Defendant published defamatory statements about Kassenoff for the public to read. AC ¶198. The AC lacks any allegation that Defendant directly sent any communications to Kassenoff or directly tagged Kassenoff in any Catherine-Series video or comment as required to "'cross the line' in terms of First Amendment protection". *Krapacs,* 301 So. 3d at 979. Where "comments are made on an electronic medium to be read by others, they cannot be said to be directed to a particular person" as required by Fla. Stat. § 784.048. *Blum,* 191 So. 3d at 504

(quoting *David v. Textor*, 189 So. 3d 871 (Fla. 4th DCA 2016)). Defendant's making, posting, and commenting on the Catherine-Series, despite such being about Kassenoff, does not constitute conduct directed at him. *Krapacs*, 301 So. 3d at 976 (finding that Krapacs did not engage in cyberstalking through her social media posts about Bacchus or by attempting to reach Bacchus's former clients to file bar complaints and malpractice suits against her); *Grayson*, 2021 WL 2869870 at *6 (noting that Florida courts have held that appellant sending "derogatory emails about the appellee to over 2,000 third parties, none of [which] where sent directly to the appellate" ... "cannot be said to be directed to a particular person").

Other than Video 4, which only included Kassenoff's contact information, the AC fails to allege any communication, nor a series of communications, by Defendant directed to Kassenoff specifically. *Krapacs*, 301 So. 3d at 978; *Grayson*, 2021 WL 2869870 (finding that defendants social media posts directed to Florida voters to influence Florida residents were not directed to plaintiff); *Textor*, 189 So. 3d at 871 (finding that online postings were not directed to a specific person where they criticized the business). In fact, the AC fails to specify even one instance in which Defendant directed a communication to Kassenoff and lacks any factual allegations linking the third-party communications received by Kassenoff to the Catherine-Series (AC ¶103) rather than to the public Suicide Post (AC ¶¶60-61) or other media attention Kassenoff received. AC ¶135; Exhibit "33" ("the Frank Report published

the [Suicide Post], and several follow up stories. It went viral and was followed by numerous others including" Defendant). Accordingly,  Defendant's alleged actions do not qualify as additional instances of repeated cyberstalking or harassment. *Krapacs*, 301 So. 3d at 976. As such, the AC fails to plead a "course of conduct" as is required to maintain a cyberstalking/harassment claim. *Id.*

Additionally, the AC fails to allege any communication that would have caused Kassenoff to endure substantial emotional distress as required by Fla. Stat. § 784.048. Kassenoff's alleged distress related to his personal and professional reputation (AC ¶ 138) does not constitute substantial emotional distress under the statute. *Blum,* 191 So. 3d at 505. Moreover, posting content that involves actions taken by a plaintiff, or republishes articles or headlines involving a plaintiff, "may be embarrassing to [Kassenoff but] is not at all the same as causing substantial emotional distress. *Textor*, 189 So. 3d at 871. Defendant's posts merely republished Catherine's publications of videos and documents – albeit very embarrassing to Kassenoff, but truthful.  (AC).

Dismissal is further warranted because the requested injunction would constitute an unconstitutional prior restraint in violation of Defendant's First Amendment rights. Kassenoff seeks to restrain Defendant from "making and/or uploading any more videos and/or comments about Mr. Kassenoff" (collectively the "Relief"). AC ¶109A. Court-ordered injunctions that regulate speech are subject to

First Amendment scrutiny. *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 764 (1994). "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States,* 509 U.S. 544, 550 (1993)(citation omitted, emphasis in original). "Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." *Id.*

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976). "The fact that speech may now occur in "cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular," does not mean that governmental regulation of that speech is beyond the reach of First Amendment analysis and scrutiny." *Krapacs*, 301 So. 3d at 976; *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 327 (2010)("Courts, too, are bound by the First Amendment [and] [w]e must decline to draw, and then redraw, constitutional lines based on the particular media or technology used"). Indeed, as recognized by Florida courts:

> Angry social media postings are now common. Jilted lovers, jilted tenants, and attention-seeking bloggers spew their anger into fiber-optic cables and cyberspace. But analytically, and legally, these rants are essentially the electronic successors of the pre-blog, solo complainant

holding a poster on a public sidewalk [protesting – i.e. a protected activity]

*Krapacs*, 301 So. 3d at 976 (citation omitted)(reversing a §784.046 injunction where the respondent blogged extensively about petitioner and many of the blog posts were arguably defamatory). This protection against prior restraints on speech extends to both false statements and to those from which a commercial gain is derived. *Blum*, 191 So. 3d 502, at 505; *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)("a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.")

In *Krapacs*, the court issued an injunction prohibiting Krapacs from posting on social media or internet websites, anything that referenced the plaintiff.  301 So. 3d at 976. Noting that the injunction "fully regulate[ed] and put[] limits on any expression that relates to a particular subject, i.e. Bacchus" the appellate court found the injunction to be overly broad prior restraint on free speech and dismissed the injunction. *Id.* at 980.

In *Textor*, the appellate court reversed a similar injunction, which had enjoined the appellant from both communicating with the respondent directly and through third parties and from posting the respondents information online. In *Textor*, the appellate court held that "banning someone from posting about someone else on social media was a prior restraint" that "violates the Constitution" because "[t]he

injunction prevents not only communications *to* Textor, but also communications *about* Textor". *Id.*

Here, Kassenoff seeks preliminary and permanent injunctions enjoining Defendant from "making or positing any more videos and/or comment about Mr. Kassenoff" (AC p. 109¶A) on the contention that Defendant "created and uploaded dozens of false, defamatory and harassing videos of Mr. Kassenoff" (albeit they were reposts from Catherine's publications) for which Kassenoff will suffer irreparable harm if not enjoined from doing so. AC ¶¶199-200. For the reasons stated above, this claim should be dismissed (with prejudice).

### F. THE DEFAMATION CLAIMS (COUNTS I, II, AND III) FAIL UNDER THE FAIR REPORTING PRIVILEGE

The Defamation claims should be dismissed pursuant to New York law as commentary on legal proceedings are subject to the Fair Reporting defense afforded pursuant to N.Y. Civ. Rights Law §74.  N.Y. Civ. Rights Law §74 provides immunity to persons who make statements appearing in the media that fairly and truly summarize or restate the allegations in judicial filings. *Shawe v. Kramer Levin Naftalis & Frankel LLP*, 167 A.D.3d 481, 482-483 (1st Dep't 2018).

N.Y. Civ. Rights Law §74 is meant to immunize free and unfettered reporting on judicial proceedings, as such permits publication of the allegations in a complaint even where those allegations are "false as a matter of fact." *Glantz v. Cook United,*

*Inc.*, 499 F. Supp. 710, 715 (E.D.N.Y. 1979), *aff'd*, 636 F.2d 1201 (2d Cir. 1980)(internal citations omitted); *see also* N.Y. Civ. Rights Law. §74 (providing that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding"). Whether a statement is protected by the fair report privilege is a question of law for the court, and such can be decided at the motion to dismiss stage. *Ford v. Levinson*, 90 A.D.2d 464, 465 (1st Dep't 1982).

For a defendant to avail him/herself of the New York fair reporting privilege, his/her public statements need not describe the judicial proceeding with absolute precision. Consistent with the privilege's purpose of "provid[ing] broad protection [against defamation claims] to news accounts of judicial or other proceedings," New York courts have "established a liberal interpretation of the 'fair and true report' standard" that permits some inaccuracy. *Becher v. Troy Pub. Co.*, 183 A.D.2d 230, 233 (3d Dep't 1992). Under that generous rule, "[f]or a report to be characterized as 'fair and true' within the meaning of the fair report statute . . . it is enough that the substance of the article be *substantially* accurate." *Holy Spirit Ass'n for the Unification of World Christianity v. New York Times Co.*, 399 N.E.2d 1185, 1187 (1979). Even where a report deviates somewhat from a true and accurate description of a judicial proceeding, it will be deemed "substantially" accurate unless "the published account of the proceeding would have a different effect on the reader's

mind than the actual truth, if published." *See Daniel Goldreyer, Ltd. v. Van De Wetering*, 217 A.D.2d 434, 435 (1st Dep't 1995).

Additionally, courts have routinely applied the fair reporting privilege to reports containing minor overstatements of the misconduct at issue. *Gurda v. Orange County Publications Div. of Ottaway Newspapers, Inc.*, 81 A.D.3d 120, 132-133 (2d Dep't 1981), *aff'd*, 436 N.E.2d 1326, 1327 (1982)(the defendant newspaper reported that the plaintiffs had been found "guilty of intentional fraud", but no criminal charges were pled and only a finding of liability under an obscure provision of the bankruptcy code, newspaper's report determined to be "substantially true," even if not "precisely or technically correct by every possible definition."); *see also Holy Spirit*, 399 N.E.2d at 1188 (applying fair report privilege to newspaper article that reported sources as "confirmed" and "stated as fact" when they were actually unverified, even though these words could denote "a sense of legitimacy which, in hindsight, could be characterized as imprudent"); *George v. Time, Inc.*, 259 A.D. 324, 325, 328 (1st Dep't 1940), *aff'd,* 39 N.E.2d 941, 942 (1942).

Kassenoff's allegations to in support of the Defamation Claims each arises from (1) Catherine's statements about the Matrimonial Action; (2) the conduct of Kassenoff, attorneys, professionals and the Matrimonial Court in the Matrimonial Action; and (3) the documents and videos in Catherine's public Dropbox that were either (a) relevant to the Matrimonial Action and/or Matrimonial Court, (b) used in

the Matrimonial Action, or (3) establish Catherine's claims about the Matrimonial Action and/or the Matrimonial Court. Not one of Kassenoff's allegations relates to anything other than the Matrimonial Action, which albeit includes reporting about Kassenoff throughout his marriage to Catherine as at issue in the Matrimonial Action. Additionally, Defendant's statements and publications were merely the republication of Catherine's statements and commentary/reporting thereon.

Therefore, Defendant's reporting via his social media forum about Kassenoff and the Matrimonial Action is protected speech and not actionable as alleged and should be dismissed with prejudice.

## **CONCLUSION**

For the foregoing arguments, the Amended Complaint should be dismissed with prejudice as any amendment would be futile.

### **Certificate of Compliance with Local Rule 7.1(F)**

I certify that the Motion contained herein complies with the word limit set forth in Local Rule 7.1(F) as the Motion contains 7676 words in accordance with Microsoft Word's word count function.

Respectfully submitted,

DAVIDOFF LAW FIRM, PLLC

By:          **/JMD/**
＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Jonathan Marc Davidoff, Esq.
Florida Bar Number 179833

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY ON THIS 27th day of November 2023, that a copy of the foregoing Motion to Dismiss and Incorporated was provided to all parties of record by the electronic filing via CM/ECF.

By: **/JMD/**
Jonathan Marc Davidoff, Esq.
Florida Bar Number 179833