# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**ALLAN A. KASSENOFF**,
individually and as guardian of his
minor children A.K., C.K., and J.K.,

      **Plaintiff**,

v.                               **Case No. 3:23cv24085-TKW-ZCB**

**ROBERT HARVEY**,

      **Defendant**.
_____/

## ORDER DISMISSING AMENDED
## COMPLAINT WITH LEAVE TO AMEND

This case is before the Court based on Defendant's motion to dismiss the amended complaint (Doc. 11). Upon due consideration of the motion, Plaintiff's response in opposition (Doc. 13), and the amended complaint (Doc. 7), the Court finds that the motion is due to be granted.

## Facts

Plaintiff is a lawyer from New York. Defendant is a "social media influencer" from Pensacola, Florida, with millions of followers on TikTok and other social media platforms.

Plaintiff and his then-wife, Catherine Kassenoff, were involved a contentious divorce and child custody proceeding in a New York court, starting in 2019. During

the case, the court awarded sole temporary custody of the Kassenoffs' three children to Plaintiff and restricted (and ultimately suspended) Ms. Kassenoff's right to visit the children.

On May 27, 2023, a few weeks after losing her visitation rights, Ms. Kassenoff posted on Facebook that she would be "ending [her] own life" by medically assisted suicide in Switzerland because she had a terminal health condition[1] and she could "no longer endure the abuse and terror" inflicted on her by Plaintiff.  She asserted that the court system failed to protect her and her children by "favor[ing] the monied party," and she provided a link to a public Dropbox containing the children's mental health records, some of the court documents from the Kassenoffs' matrimonial proceeding, and old videos of Plaintiff and the children.  She also encouraged her followers to share those documents everywhere and to "organize [themselves], use the facts of [her] case … and make change."

On May 31, 2023, four days after Ms. Kassenoff's Facebook post, Defendant began posting videos on social media about Plaintiff.  In the videos, Defendant depicted Plaintiff as an abusive spouse and father who took advantage of the New York court system by "pa[ying] off" court-appointed officials during the

---

[1] Plaintiff alleges that Ms. Kassenoff lied about having a terminal health condition to make her story more sympathetic.

matrimonial proceeding.  The videos have received approximately 39 million views, 5 million likes, and 150,000 comments.

In a series of videos from June 7 to June 9, 2023, Defendant encouraged his followers to "bombard" Plaintiff's law firm, Greenberg Traurig (Greenberg), and its clients with emails, phone calls, voicemails, and social media attacks "demanding" Plaintiff's termination.  Greenberg received "many, many emails … as a result of [Defendant's] incitement," including one stating "[t]he emails, the calls, they won't stop until you do the right thing and FIRE HIM …. FIRE KASSENOFF OR WE WILL NOT STOP."

On June 9, 2023, as a result of these actions, the CEO of Greenberg informed Plaintiff that the firm had no choice but to sever ties with him.  Plaintiff was told that he had to voluntarily resign or he would be fired, and two days later, Plaintiff "forcibly resigned" from the firm.

### Procedural History

In September 2023, Plaintiff and the attorney who represented him in the matrimonial proceeding, Constantine Gus Dimopoulos, filed suit against Defendant in this Court.  Two weeks later, before Defendant was served, an amended complaint was filed dropping Mr. Dimopoulos as a plaintiff.  The sole plaintiff named in the amended complaint is Plaintiff, individually and as the guardian of his minor children, A.K, C.K, and J.K.

The amended complaint is 110 pages long and contains 205 numbered paragraphs and nearly 150 additional unnumbered bullet-point subparagraphs. It asserts five counts on behalf of Plaintiff individually—defamation per se (Count I), general defamation (Count II), defamation by implication (Count III), tortious interference with a business relationship (Count V), and "cyberstalking" (Count VI)—and one count on behalf of Plaintiff's minor children—intentional infliction of emotional distress (IIED) (Count IV).

Defendant responded to the amended complaint with a motion to dismiss. The motion is fully briefed and is ripe for a ruling. No hearing is needed to rule on the motion.

## Analysis

Defendant argues that the amended complaint should be dismissed because (1) it violates Fed. R. Civ. P. 8 and 10 and is a "shotgun pleading," and (2) each count fails to state a claim upon which relief can be granted. Each argument will be addressed in turn.

### A.    Shotgun Pleading

Defendant argues that the amended complaint violates Rules 8 and 10 and is a shotgun pleading because (1) he cannot ascertain which videos, statements, and comments are alleged to be defamatory; (2) it is "riddled with irrelevant allegations"; (3) it is "excessively long"; (4) the defamation claims all incorporate the same facts;

(5) the IIED claim and cyberstalking claim incorporate the same facts; and (6) the IIED claim "lumps both Plaintiffs together."  The second and third arguments have merit, but the others do not.

Under Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and under Rule 10(b), the pleader "must state [his] claims … in numbered paragraphs, each limited as far as practicable to a single set of circumstances." "When a complaint fails to follow Rules 8 and 10, it may be classified as a shotgun pleading."  *Hickman v. Hickman*, 563 F. App'x 742, 744 (11th Cir. 2014).

Shotgun pleadings include complaints that:

(1) contain multiple counts where each count adopts the allegations of all preceding counts; (2) are replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) do not separate into a different count each cause of action or claim for relief; or (4) assert multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions.

*KPOKYC v. President*, 858 F. App'x 289, 291 (11th Cir. 2021) (citation and quotation marks omitted).  "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).

Here, the amended complaint is not a prototypical shotgun pleading because, for the most part, it is logically organized and well written, and at least in a general sense, it provides Defendant fair notice of the claims against him.  However, the sheer length of the complaint and the way some of its allegations are pled make it more difficult than it needs to be for Defendant to frame a responsive pleading and suggest that the amended complaint was intended for a broader public audience than Defendant and the Court.  Thus, the amended complaint violates the letter (and spirit) of Rules 8 and 10 and it needs to be re-pled in its entirety to conform to those rules.

The Court understands that "length alone does not make a shotgun pleading," *McKinney v. Portico, LLC*, 2023 WL 2889737, at *4 n.4 (N.D. Fla. Mar. 30, 2023), but an unnecessarily long complaint can still violate the "short and plain statement" requirement in Rule 8(a)(2).  *See, e.g., Bonnie L. ex rel. Hadsock v. Bush*, 180 F. Supp. 2d 1321, 1348 (S.D. Fla. 2001) (holding that a 116-page complaint violated Rule 8 in part because the first forty-six pages "contain[ed] a narrative account of the history of each [p]laintiff that read[] like a closing argument"), *rev'd on other grounds by 31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003).  Indeed, "redundant and long-winded complaints 'impede the due administration of justice and, in a very real sense, amount to the obstruction of justice' because they are in no way 'short and plain statement(s) of the claim(s)' as required by Rule 8." *Pominansky v. Jarj Constr. Corp.*, 2007 WL 2900275, at *1 (S.D. Fla. Oct. 2, 2007)

(quoting *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002)).

Here, the amended complaint is anything but "short and plain"—it spans 110 pages and contains 205 numbered paragraphs and another nearly 150 unnumbered bullet-point subparagraphs, and by any measure, is far longer than it needs be.[2]  It also contains numerous allegations that appear to have little to nothing to do with the legal claims asserted in the case and are replete with unnecessary commentary.

For example, the first six pages of the amended complaint contain a slanted narrative about the "nature of the action," which reads more like a magazine article than allegations in a legal pleading, and the first 67 paragraphs (and nearly 40 pages) purport to provide a "backdrop" for the allegations about the allegedly defamatory videos on which Plaintiff's claims are based that start at paragraph 68.  The amended complaint also includes gratuitous (or at least far more extensive than necessary) allegations about things such as the attempted conception and ultimate adoption of Plaintiff's children, Ms. Kassenoff's revenge plot on an ex-boyfriend, accolades about Plaintiff's law practice, the content of witness testimony from Plaintiff's matrimonial proceedings, the details of the matrimonial proceedings and content of

---

[2]  For what it's worth, the undersigned has not seen a complaint anywhere near 110 pages long in nearly 30 years as an attorney and judge, including the past 5 years on the federal bench presiding over far more complex and factually extensive cases than this.

the court's orders, and direct message communications between Defendant and his followers about subjects unrelated to Plaintiff.[3]

Background information can be helpful or even necessary at times, but the focus of a complaint should be the events giving rise to the cause of action. Here, the events giving rise to Plaintiff's claims mostly occurred over a several week period in May and June 2023, and it should not take anything close to 100 pages (or even half that) to articulate what happened leading up to and during that short period of time that gave rise to Plaintiff's claims.

The Court understands that Plaintiff feels that he has been wronged by Defendant (and, if the allegations in the amended complaint are true, he may very well have been),[4] but the amended complaint is not the place for Plaintiff to tell his entire side of the story or to air salacious details about Ms. Kassenoff from the

---

[3] To the extent that any of these allegations are relevant to the legal claims asserted in this case (as "backdrop" or otherwise), there is no reason that they could not be more succinctly stated. For example, the four pages of allegations detailing the sworn statements submitted by the children's nannies in the matrimonial proceedings, *see* Doc. 7 at 11-15 (¶¶24-27), could have simply alleged that "the children's nannies testified in the matrimonial proceedings about Ms. Kassenoff's mistreatment of the children." The same is true of the numerous pages of seemingly unnecessary "backdrop" allegations that could have been boiled down to their most salient points—if not omitted altogether.

[4] The Court also understands that Plaintiff is representing himself in this case, but he can (and will) be held to a higher standard than a typical pro se party in his pleadings because he is a lawyer. *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 908 n.1 (11th Cir. 2013) ("Because [Plaintiff] is a licensed lawyer, his complaint does not receive the liberal construction typically afforded *pro se* plaintiffs' complaints."). The Court also understands that this case is personal to Plaintiff, but if he is going to be unable to keep his personal feelings out of his pleadings and the way he litigates this case, he might want to consider hiring an attorney to represent him in this case.

matrimonial proceeding.  *See Rutan v. Carswell Cherokee Trust*, 2020 WL 3578466, at *4 (S.D. Ga. July 1, 2020) ("[T]he judiciary is not an appropriate forum simply to air grievances.") (citation and quotation marks omitted).   Thus, the amended complaint needs to be re-pled to eliminate the extensive extraneous factual allegations and unnecessary commentary and simply present a "short and plain statement" of the claims that Plaintiff is asserting and the grounds upon which those claims rest.

When the amended complaint is re-pled, it will also need to better adhere to Rule 10(b), which requires claims to be "state[d] … in numbered paragraphs, each limited as far as practicable to a single set of circumstances."   The amended complaint repeatedly violates this rule by including numerous unnumbered sub-paragraphs and numerous multi-sentence paragraphs.   Although there is nothing inherently wrong with including sub-paragraphs or multi-sentence paragraphs in a complaint, the sub-paragraphs need to be numbered (or lettered) and the multi-sentence paragraphs that involve distinct allegations need to be broken into separate paragraphs without editorial commentary so Defendant can respond to them in a way that will enable the parties (and the Court) to determine which factual allegations are in dispute as the case proceeds to discovery, dispositive motion practice, and trial.[5]

---

[5]   Just by way of example, paragraph 74 contains seven sentences alleging multiple distinct points and containing unnecessary commentary—e.g., "[t]ellingly," "[i]n reality," and "[e]ven worse."   Numerous other paragraphs have these same problems.

Based on the Court's determination that the amended complaint needs to be entirely re-pled, the Court need not address the other grounds upon which Defendant argues that the amended complaint violates Rules 8 or 10 or is a shotgun pleading. However, the Court will address those issues in the interest of preempting further motion practice after if Plaintiff files a second amended complaint.

There is no merit in Defendant's argument that the amended complaint fails to clearly identify which statements are alleged to be defamatory. The amended complaint includes an entire section focused on the allegedly defamatory statements and it even groups the statements into different categories, such as statements regarding abuse and paying off professionals in the matrimonial proceeding. *See* Doc. 7 at 42-70. Moreover, for each allegedly defamatory statement made by Defendant in a video, the amended complaint provides a footnote identifying the source of the statement and emphasizes the parts of the statement alleged to be defamatory. *See e.g., id.* at ¶¶78, 80-85. Likewise, for each allegedly defamatory statement made by Defendant in a social media post or comment, the amended complaint provides a screenshot of the post and draws a red box around the specific text alleged to be defamatory. *See, e.g., id.* at ¶79, 92. Thus, even though many of the allegations in this section of the amended complaint contain extraneous commentary and need to be more succinctly stated, they still provide Defendant adequate notice as to which videos and statements are alleged to be defamatory.

There is also no merit to Defendant's arguments that some of the counts impermissibly incorporate the same allegations.  Although it is true that a complaint cannot "incorporate every antecedent allegation by reference into each subsequent claim for relief," *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006), a complaint may incorporate the same background facts into each count, *Ropella Grp Inc. v. Loparex LLC*, 2022 WL 18539364, at \*2 n.4 (N.D. Fla. Oct. 25, 2022) ("[T]he complaint is not a 'shotgun pleading' because it does not improperly incorporate all counts into each successive count as Defendant contends; rather, it merely incorporates common factual allegations into each count—which is not prohibited.").  Here, the three defamation claims incorporate the same background facts, as do the IIED and cyberstalking claims, but none of those claims incorporate allegations from other claims.  Thus, dismissal is not warranted on that basis.

Finally, there is no merit to Defendant's argument that the IIED claim improperly "lumps both Plaintiffs together."  Indeed, putting aside the fact that there is now only one plaintiff in this case (albeit in two separate capacities), the amended complaint is clear that the IIED claim is brought only on behalf of Plaintiff's children.

\*     \*     \*

In sum, for the reasons stated above, the Court finds that the amended complaint violates Rules 8 and 10 and needs to be re-pled in its entirety.

<u>B.     Failure to State a Claim</u>

The Court need not consider Defendant's arguments as to why each count fails to state a plausible[6] claim upon which relief based on the determination that the amended complaint needs to be re-pled in its entirety. However, because most of those arguments lack merit, the Court will address them now in the interest of avoiding additional motion practice if and when Plaintiff files a second amended complaint.

Defendant argues that (1) the "single publication rule" bars the tortious interference and IIED claims; (2) Plaintiff has not adequately alleged an IIED claim; (3) Plaintiff has not adequately alleged a tortious interference claim; (4) Plaintiff has not adequately alleged a cyberstalking claim; and (5) the defamation claims are barred under the fair reporting privilege. Each argument will be addressed in turn.[7]

---

[6] "To survive a motion to dismiss [under Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Detailed factual allegations are not required to state a claim, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

[7] Plaintiff did not address Defendant's arguments in the order they were presented in the motion to dismiss, which is not only poor practice but it also made the Court's review of the issues framed by the parties' filings more difficult than it needed to be. *See Rolling v. State ex rel. Butterworth*, 630 So. 2d 635, 636 (Fla. 1st DCA 1994) ("An Appellee should address the issues in the same order as they are presented in the Initial Brief so that the court can be certain which arguments are being addressed.").

1.    *Single Publication Rule*

Defendant argues that the tortious interference and IIED claims should be dismissed under the single publication rule because those claims are based on the same allegations as the defamation claims—i.e., that Defendant disseminated defamatory statements that damaged Plaintiff's employment and professional reputation.  Plaintiff responds that the tortious interference claim is not barred by the single publication rule because (1) the tortious interference claim is based on Defendant encouraging his followers to "attack" Greenberg and its clients in order to get Plaintiff fired and the defamation claims are based on other statements, and (2) the IIED claim is brought on behalf of the children whereas the defamation claims are brought on behalf of Plaintiff himself.  The Court agrees with Plaintiff on both points.

"[The] single publication/single action rule precludes the recasting of defamation claims as additional, distinct causes of action in tort if all of the claims arise from same defamatory publication."  *Int'l Sec. Mgmt. Grp., Inc. v. Rolland*, 271 So. 3d 33, 48 (Fla. 3d DCA 2018) (citing *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992)).  "The rule is designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm."  *Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002)

(citation omitted).  However, the rule does "not prevent recovery upon separate causes of action which are properly pled upon the existence of independent facts." *Fridovich*, 598 So. at 70.

Here, the tortious interference claim is not barred by the single publication rule because, as Plaintiff argues, it is based on different statements than the defamation claim.  *See GRLPWR, LLC v. Rodriguez*, 2023 WL 5666203, at *7 (N.D. Fla. Aug. 25, 2023) (allowing tortious interference claim to proceed alongside a defamation claim where the claims arose from the same videos but each claim was based on different statements in the videos).  Likewise, the single publication rule does not bar the IIED claim because that claim is brought on behalf of Plaintiff's children, not Plaintiff, and none of the statements on which the IIED claim is based are alleged to have defamed the children.

Accordingly, the tortious interference and IIED claims are not due to be dismissed based on the single publication rule.

### 2.     *IIED*

Defendant argues that the IIED claim should be dismissed because (1) the amended complaint does not allege that his conduct was directed at Plaintiff's children, (2) his conduct was not outrageous, and (3) the amended complaint does not adequately allege that Defendant's conduct caused the children to suffer severe

and emotional distress.  The third argument is meritless,[8] but the Court agrees with the other two arguments.

To state a claim for IIED under Florida law,[9] a plaintiff must allege "(1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe." *Haberski v. Bufano*, 728 F. App'x 903, 909 (11th Cir. 2018) (quoting *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594 (Fla. 2d DCA 2007)).  The first element requires "the plaintiff [to] show that the defendant's conduct was directed at the plaintiff." *Lincoln v. Fla. Gas Transmission Co. LLC*, 608 F. App'x 721, 722 (11th Cir. 2015) (citing *Baker v. Fitzgerald*, 573 So. 2d 873, 873 (Fla. 3d DCA 1990)).  The second element requires actions that are "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Clemente v. Horne*, 707 So. 2d 865, 867 (Fla. 3d DCA 1998) (quoting Restatement (Second) of Torts, §46 cmt. d (1965)).

---

[8]  The amended complaint provides specific examples of the "severe emotional distress" the children allegedly suffered as a result of Defendant's actions, *see* Doc. 7 at ¶154, and it also alleges that Defendant recognized that his actions might be "adding to [the children's] trauma," *id.* at ¶155.

[9]  The parties agree that Florida law applies to all of the claims except the defamation claims.

Here, the amended complaint does not allege that Defendant's conduct was directed at the children. Indeed, when the amended complaint is viewed as a whole, it is clear that Defendant's actions were directed solely at Plaintiff. Accordingly, because Plaintiff has not alleged any facts showing that Defendant's actions were directed at the children, the amended complaint fails to state a plausible IIED claim on behalf of the children. *See Gomez v. City of Mia.*, 2023 WL 6376511, at *11 (S.D. Fla. Sept. 29, 2023) (dismissing IIED claim based on a social media post because the complaint failed to "provide any facts to suggest that [the defendant] directed [the post] at" the plaintiff).

The Court did not overlook *Paul v. Mayo Clinic*, 2016 WL 11431491 (M.D. Fla. June 16, 2016), but Plaintiff's reliance on that case is misplaced. In *Paul*, a hospital induced one of the plaintiffs to wire a large sum of money to the hospital from a family trust fund to pay for a relative's liver transplant, but it turned out that the relative was not even eligible for the procedure. *Id.* at *1-2. The plaintiff who wired the money to the hospital and other family members brought an IIED claim based on the hospital's fraudulent misrepresentation. *Id.* at *4-5. The hospital argued that the other family members' IIED claim should be dismissed because the hospital's conduct was not directed at them, but the court rejected that argument because the complaint effectively alleged that the hospital perpetrated a fraud on the

entire family. *Id.* at *5. Here, unlike *Paul*, Defendant's actions were only directed at Plaintiff, not his children or other members of his family.

The Court also did not overlook Plaintiff's argument that the children were directly impacted by Defendant's conduct because he showed the children's unblurred faces in one video and showed a series of messages that one of the children allegedly sent to Defendant in another video. However, even if those actions could somehow be construed as having been "directed at" the children, those actions do not, without more, constitute outrageous conduct.

Accordingly, the IIED claim in Count IV of the amended complaint will be dismissed.

### 3.    *Tortious Interference*

Defendant argues that the tortious interference claim should be dismissed because (1) such a claim cannot be based on "news reporting," and (2) Plaintiff has not adequately alleged that Defendant's actions interfered with Plaintiff's business relationships with Greenberg's clients or Greenberg. The first argument is meritless,[10] but there is merit to part of the second argument.

"Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff

---

[10] The tortious interference claim is based on "[Defendant's] instructions to his 3,000,000+ followers to attack Greenberg Traurig and its clients," Doc. 7 at ¶189, not any sort of "news reporting."

existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff." *Int'l Sales & Serv., Inc. v. Austral Insulated Prods. Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)). The business relationship "need not be evidenced by an enforceable contract," but it "must afford the plaintiff existing or prospective legal or contractual rights," *Ozyesilpinar v. Reach PLC*, 365 So. 3d 453, 460 (Fla. 3d DCA 2023) (citations and quotation marks omitted), and it must be "in existence at the time of any alleged interference," *Bernstein v. True*, 636 So. 2d 1364, 1366 (Fla. 4th DCA 1994).

### a.    Greenberg's Clients

Defendant argues that the tortious interference claim should be dismissed insofar as it is based on his alleged interference with Plaintiff's relationship with Greenberg's clients because (1) the amended complaint fails to identify any specific client other than Samsung that Defendant interfered with; (2) the amended complaint fails to allege the extent of Plaintiff's business relationships with Greenberg's clients; (3) Greenberg's clients were clients of the firm, not Plaintiff; (4) the amended complaint does not allege that Plaintiff represented the Greenberg clients at the time of the interference or that there was an understanding that he would represent them in the future; (5) the amended complaint does not allege that

18

Greenberg's clients terminated an existing relationship they had with Plaintiff; and (6) any interference was indirect.

The Court agrees with the fourth argument. Plaintiff did not allege that the relationship between him and any of the Greenberg clients existed at the time of the alleged interference or that he had an agreement to represent them in the future. Rather, the complaint only alleges that Plaintiff "represented" (past tense) many clients "over the years." Doc. 7 at ¶125.[11] Thus, Plaintiff has failed to allege an existing or prospective business relationship with any of Greenberg's clients. Although that failure is sufficient to resolve the motion to dismiss the tortious interference claim as it relates to Greenberg's clients, the Court will address the other arguments raised by Defendant with respect to the Greenberg clients in the interest of preempting further motion practice if Plaintiff attempts to re-state that portion of the tortious interference claim in the second amended complaint.

---

[11] The Court did not overlook Plaintiff's argument that the Court can take judicial notice of the fact that he represented Samsung at the time of the interference in *MemoryWeb, LLC v. Samsung Electronics Co. et al.*, N.D. Cal. Case No. 3:22cv3776. However, the docket in that case does not unequivocally show that Plaintiff had a relationship with Samsung at the time of the interference because that case has been stayed since August 2022 (approximately nine months before the interference) and the last filing in that case was in February 2023 (approximately three months before the interference). Moreover, the mere fact that Plaintiff is still listed as counsel of record in CM/ECF does not necessarily mean that he was representing Samsung at the time of the interference because Plaintiff is still shown as being associated with Greenberg, which is obviously not accurate.

With respect to the first argument, if Plaintiff's tortious interference claim is based on interference with Greenberg clients other than Samsung, he will need to identify those clients by name and explain how Defendant's actions interfered with his relationship with those clients. *See Kamau v. Slate*, 2023 WL 3142306, at *5 (N.D. Fla. Jan. 17, 2023) ("Under Florida law, plaintiffs alleging tortious interference with business relationships are required to specifically identify the customers or clients that are the subject of a defendant's alleged interference in their complaint.").[12]  The Court did not overlook that Plaintiff named a number of other clients that he "represented … over the years," Doc. 7 at ¶125, but he did not allege that Defendant did anything to interfere with his relationships with any of those clients, as he allegedly did with Samsung.

With respect to the second argument, although Plaintiff need not detail the extent of his business relationship with the Greenberg's clients, he must at least allege that he had an existing relationship of some nature with particular clients that "in all probability would have [continued] if the defendant had not interfered." *Collier HMA Physician Mgmt., LLC v. NCH Healthcare Sys.*, 591 F. Supp. 3d 1204,

---

[12]  The Court did not overlook *Deligdish v. Bender*, 2023 WL 5016547 (M.D. Fla. Aug. 7, 2023), cited by Plaintiff, but the Court finds that case unpersuasive.  The court appears to have based its holding that a plaintiff need not specifically identify those with whom it had a business relationship to state a tortious interference claim on the fact that the court was "unaware of any authority" requiring a plaintiff to do so.  *Id.* at *9.  However, the court must have overlooked *Sarkis v. Pafford Oil Co., Inc.*, 697 So. 2d 524, 526 (Fla. 1st DCA 1997), which affirmed the dismissal of tortious interference claim because "[t]he amended complaint d[id] not identify the customers who were the subject of the alleged interference."

1214-15 (M.D. Fla. 2022) (quoting *Ethan Allen*, 647 So. at 815). The amended complaint does not include any such allegations.

With respect to the third argument, although Plaintiff did not specifically allege which Greenberg clients were "his" clients, he did allege that he had "advantageous contractual and business relationships with … [Greenberg's] clients." Doc. 7 at ¶186. That would be sufficient if the amended complaint had also alleged which particular clients those relationships were with.

With respect to the fifth argument, although Plaintiff does not specifically allege which Greenberg clients terminated their attorney-client relationship with him, he does allege that his client relationships suffered because his reputation was harmed by Defendant's actions, *see id.* at ¶189, and reputational harm is an adequate basis for a tortious interference claim, *see SIG Sauer, Inc. v. D&M Holding Co., LLC*, 2022 WL 445747, at *7 (M.D. Fla. Feb. 14, 2022).

With respect to the sixth argument, Plaintiff alleges that Defendant encouraged his audience to "attack" Greenberg's clients and that his client relationships suffered as a result. That is not indirect interference.

In sum, as currently pled, the tortious interference claim is due to be dismissed insofar as it is based on Defendant's alleged inference with Plaintiff's relationships with Greenberg clients. The Court cannot say at this point that it would be futile for

Plaintiff to re-plead this aspect of the tortious interference claim, so he may do so in the second amended complaint.

### b.    *Greenberg*

Defendant argues that Plaintiff has failed to state a claim for tortious interference insofar as that claim is based on his relationship with Greenberg because (1) Plaintiff failed to plead that Defendant's conduct—rather than Greenberg's internal investigation—caused Plaintiff to lose his job, and (2) Plaintiff caused his own damages by voluntarily resigning.  Neither argument is persuasive.

With respect to the first argument, Plaintiff pled that Defendant encouraged his audience "to attack Greenberg Traurig and its clients in order to get [Plaintiff] fired," Doc. 7 at ¶6, *see also id.* at ¶126; his followers obliged and "bombarded" Greenberg with emails, phone calls, voicemails, and social media attacks demanding his termination, *id.* at ¶132; and Plaintiff lost his job shortly thereafter as "a direct and proximate result of [Defendant's] actions," *id.* at ¶133.  These allegations are sufficient to allege causation, particularly when coupled with the allegation that Defendant boasted on social media that he got Plaintiff fired.  *Id.* at ¶134 ("I got Samsung to fire this man.  I got his law firm to fire this man.") (emphasis added).

With respect to the second argument, Plaintiff alleged that he did not resign voluntarily, but rather he "forcibly resigned." *Id.* at ¶133.  Defendant did not cite to—nor did the Court's research locate—any case that supports the proposition that

a tortious interference claim cannot be based on a forced resignation.  Indeed, because a tortious interference claim only requires "an intentional and unjustified interference with [a business] relationship," *Int'l Sales &Serv.*, 262 F.3d at 1152, it is immaterial whether Plaintiff was fired or "voluntarily" resigned under threat of termination since both possibilities could be the result of an intentional and unjustified interference.

Accordingly, the tortious interference claim states a plausible claim for relief insofar as it is based on Plaintiff's relationship with Greenberg.

### 4.    *Cyberstalking*

Defendant argues that the cyberstalking claim should be dismissed because (1) the injunction it seeks would amount to an impermissible prior restraint on Defendant's speech, (2) the amended complaint does not allege that Defendant directly sent any communications to Plaintiff, and (3) the amended complaint does not plead a "course of conduct."[13]  The Court disagrees with these arguments, but finds that the cyberstalking claim is insufficiently pled for a different reason.

The cyberstalking claim refers to various provisions of §784.048, Fla. Stat., but that is a criminal statute that does not provide a civil cause of action.  Thus, the

---

[13]   Defendant also argues that the amended complaint fails to allege that Plaintiff suffered emotional distress, but that argument is meritless because Plaintiff specifically alleged that he "has [] suffered severe emotional distress, including anxiety, panic attacks, loss of appetite, depression and fear for his and his Children's safety."  *See* Doc. 7 at ¶137.

Court assumes that Plaintiff is asserting the claim alleged in Count VI of the amended complaint under §784.0485, which "created a cause of action for an injunction for protection against <u>stalking</u>."   §784.0485(1), Fla. Stat. (emphasis added).

"Stalking" is not defined in §784.0485, but §784.084(2) provides that the "offense of stalking" is committed when a person "willfully, maliciously, and repeatedly … harasses[] or cyberstalks another person."  Thus, §784.0485 provides a cause of action for an injunction for protection against harassment and/or cyberstalking, as defined in §784.048.  *See Strober v. Harris*, 332 So. 3d 1079, 1086 (Fla. 2d DCA 2002) (applying the definition of "cyberstalk" in §784.048 to claims under §784.0485); *Logue v. Book*, 297 So. 3d 605, 610-11 (Fla. 4th DCA 2020) (same); *accord Hammer v. Sorenson*, 824 F. App'x 689, 693-94 (11th Cir. 2020) (same for the definition of "harass" in §784.048).

"Harass" is defined in §748.048(1)(a) to mean "engag[ing] in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose."   "Cyberstalk" is defined in §784.048(1)(d) to mean "engag[ing] in a course of conduct to communicate, or to cause to be communicated, directly or indirectly, words, images, or language by or through the use of electronic mail or electronic communication, directed at or

pertaining to a specific person … causing substantial emotional distress to that person and serving no legitimate purpose."

Thus, to state a claim under §784.0485 based on "harassment," the plaintiff must allege that the defendant [1] willfully, maliciously, and repeatedly [2] engaged in a course of conduct [3] directed at a specific person that [4] caused substantial emotional distress to that person and [5] served no legitimate purpose.  And, to state a claim under §784.0485 based on "cyberstalking," the plaintiff must allege that the defendant [1] willfully, maliciously, and repeatedly [2] engaged in a course of conduct [3] that involved—directly or indirectly—communicating or causing to be communicated words or images [4] using electronic communications [5] directed at or pertaining to a specific person that [6] caused substantial emotional distress to that person and [7] served no legitimate purpose.  The pleading asserting such a claim must be "sworn."  §784.0485(3)(b), Fla. Stat.

A "course of conduct" requires "[a] minimum of two acts," *Lee v. State*, 268 So. 3d 904, 906 (Fla. 1st DCA 2019).  A course of conduct "directed at" a victim need not be made directly at the person and can include communications with third parties.  *See Strober*, 332 So. 3d at 1087 (reversing dismissal of petition for a cyberstalking injunction filed by plaintiff who was the subject of YouTube videos posted by defendant that led to her receiving threatening electronic communications because the definition of "cyberstalk" did not require the defendant to directly send

the communications to the plaintiff); *Logue*, 297 So. at 612 ("[S]ocial media postings that are not sent directly to an individual may nonetheless be directed at an individual in a number of ways, including by 'tagging' that person in a post, or by sufficiently describing the person in such a way as to make their specific identification possible. Such posts may also be designed so as to be reasonably likely to come to the attention of the targeted person, even if indirectly."). A communication serves a "legitimate purpose" when "there is a reason for the contact other than to harass the victim— even if the victim may find the communication disturbing." *Hammer*, 824 F. App'x at 693 (internal citation and quotation marks omitted).

Here, the amended complaint states a plausible stalking claim based on both harassment and cyberstalking. The "course of conduct" element was adequately alleged because the amended complaint alleges that Defendant posted approximately 40 videos pertaining to Plaintiff. The "directed at" element was adequately pled because the videos were unquestionably about Plaintiff and in some of the videos, Defendant appeared to be directly speaking to Plaintiff. *See, e.g.,* Doc. 7 at ¶96 ("There are reports that were written that say these children are not safe with their father. I will reveal those reports this weekend. So Allan, you've got a few more days."); *id.* at ¶141 ("Where are your videos Allan? Where are they at? Look at me. I know I know you are watching me ... I am going to be the thorn in your side until you people are in jail."); *id.* at ¶146 ("Take a look at this Allan. I've got something

really important to show you.").[14]  The fact that the videos and other posts were not

sent directly to Plaintiff by Defendant is immaterial, *see Logue*, 297 So.3d at 612;

*Strober*, 332 So. 3d at 1087, especially insofar as the claim is based on cyberstalking

because the statutory definition of "cyberstalk" includes indirect communications.

The Court did not overlook Defendant's argument that the relief Plaintiff is

seeking would violate the First Amendment because it is seeking a prior restraint on

speech.  Even if that is true,[15] that does not mean that the cyberstalking claim must

be dismissed because the Court cannot conclusively say at this point that it would be

impossible to tailor an injunction that would withstand First Amendment scrutiny.

In sum, the cyberstalking claim is not due to be dismissed based on the

arguments raised by Defendant.  However, that claim still needs to be re-pled

because §784.0485(3)(b) requires the petition to be sworn and follow a particular

format and that was not done in the amended complaint.  Those pleading deficiencies

---

[14]  The last quote is from a video in which Defendant appears to be in New York City, which is only "about a 30 minute train ride" from where Plaintiff lives.  Doc. 7 at ¶146.  That video elicited comments such as "You are in NEW YORK!!! Get 'em my friend!"  *Id.* at ¶147.

[15]  The Court tends to agree that it could not prohibit Defendant from "making and/or uploading any more videos and/or comments about [Plaintiff]," Doc. 7 at 205 (¶A), but that is not the only relief that Plaintiff is seeking in the amended complaint.  Moreover, under §784.0485(6)(a), the Court "may grant such relief as the court deems proper" in addition to an injunction when it finds that the plaintiff is a victim of stalking.

can likely be cured, so Plaintiff may reassert the cyberstalking claim in the second amended complaint.[16]

### 5. *Defamation*

Defendant argues that the defamation claims are barred by New York's fair reporting privilege—which shields commentary on legal proceedings from liability for defamation—because his reporting was centered around the matrimonial proceedings between Plaintiff and Ms. Kassenoff. Plaintiff responds that the fair reporting privilege does not apply to reports on matrimonial proceedings, and even if it did, the Court cannot determine at this stage of the case whether the fair reporting privilege applies because that would require the Court to compare Defendant's statements to the record of the matrimonial proceeding. The Court agrees with Plaintiff.

"New York Civil Rights Law §74 ('fair reporting privilege') prohibits civil actions 'against any person, firm or corporation, for the publication of a fair and true

---

[16] The Court is aware that another district court has held that federal courts lack jurisdiction to consider requests for injunctions under §784.0485, *see Harvick v. Oak Hammock Preserve Comm. Owners Ass'n, Inc.*, 2015 WL 667984, at *5 (M.D. Fla. Feb. 17, 2015), but the Court does not find the analysis in that case persuasive because it appears to be based upon a misreading of §784.0485(1)(f). That statute authorizes a petition for an injunction to be filed in the "circuit" where the respondent resides, not the "Florida circuit court for the circuit" in which the respondent resides. That said, the Court doubts that the Florida Legislature intended that claims under §784.0845 would be litigated in federal court because the injunction contemplated by the statute is akin to a domestic violence injunction that state court judges who regularly preside over injunction dockets are better suited to handle on the expedited timeframes in the statute—but that ship has arguably sailed. *See Hammer*, *supra* (considering the merits of a claim under §784.0485).

report of any judicial proceeding.'" *Tacopina v. O'Keefe*, 645 F. App'x 7, 8 (2d Cir. 2016). A publication is deemed fair and true "if it is substantially accurate," and a report is substantially accurate "if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Id.* (citations and quotation marks omitted).

The purpose of the fair reporting privilege "is to implement the public policy in favor of encouraging publication and dissemination of judicial decisions and proceedings as being in the public interest." *Beary v. West Pub. Co.*, 763 F.2d 66, 68 (2d Cir. 1985). However, the New York Court of Appeals has held that the privilege "does not attach to the publication of a report of matrimonial proceedings." *Shiles v. News Syndicate Co.*, 27 N.Y. 2d 9, 15 (N.Y. 1970).

The Eleventh Circuit has explained that the *Shiles* exception applies "only when the publication concerns court records that have been automatically sealed by operation of [New York Domestic Relations Law] §235." *Miller v. Gizmodo Media Grp., LLC*, 994 F.3d 1328, 1332 (11th Cir. 2021). Thus, if a published report is about records of a matrimonial proceeding that were automatically sealed under §235 of the New York Domestic Relations Law, the fair reporting privilege does not apply.

The Court cannot determine at this stage of the case whether the fair reporting privilege applies for two reasons. First, it is not apparent whether any of the filings

from the matrimonial proceedings about which Defendant "reported" had been automatically sealed, although it seems likely that at least some of them had been because §235(1) of the New York Domestic Relations Law broadly precludes public access to all "pleadings, affidavits, findings of fact, conclusions of law, judgment of dissolution, written agreement of separation or memorandum thereof, or testimony" in a "matrimonial action … or proceeding for custody, visitation or maintenance of a child."  Second, even if the filings had not been automatically sealed, the Court cannot determine whether Defendant's statements were a "fair and true" report of the proceedings (although the Court has its doubts) because doing so would require comparing Defendant's statements with the record of the proceedings, which the Court does not have.

Accordingly, the defamation claims are not due to be dismissed based on the fair reporting privilege.

## Conclusion

In sum, for the reasons stated above, it is **ORDERED** that:

1. Defendant's motion to dismiss (Doc. 11) is **GRANTED**, and the amended complaint (Doc. 7) is **DISMISSED without prejudice**.

2. Plaintiff shall have 21 days from the date of this Order to file a second amended complaint curing the pleading deficiencies identified in this Order.

3.    Defendant shall have 14 days from the date the second amended complaint is filed to answer or otherwise respond to it.  *See* Fed. R. Civ. P. 15(a)(3).

**DONE and ORDERED** this 8th day of February, 2024.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**